PUBLIC VERSION

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### WACO DIVISION

| | |
|---|---|
| ECOFACTOR, INC.,<br><br>    Plaintiff,<br><br>  v.<br><br>ECOBEE, INC.,<br><br>    Defendant. | Case No.: 6:20-cv-00078-ADA<br><br>**JURY TRIAL DEMANDED**<br><br>**RESTRICTED – ATTORNEYS' EYES ONLY**<br><br>**FILED UNDER SEAL** |

## ECOBEE'S CORRECTED *DAUBERT* MOTION TO EXCLUDE THE DAMAGES OPINIONS OF MR. DAVID KENNEDY

PUBLIC VERSION

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................... ii

I.      LEGAL STANDARD. ............................................................................................ 2

II.     BACKGROUND: MR. KENNEDY'S DAMAGES OPINION ............................. 3

III.    MR. KENNEDY'S OPINION RELIES ON A FAULTY ASSUMPTION OF A $5.16 ESTABLISHED ROYALTY AND FAILS TO ACCOUNT FOR THE NON-COMPARABILITY OF THE SETTLEMENT AGREEMENTS. ................................. 5

    A.   Mr. Kennedy's finding of an "established royalty" is unreliable, unproven, and not tied to the facts of the case. ................................................................................................. 6

       1.   Mr. Kennedy did not, and cannot, verify that the $5.16 rate was ever applied ............... 6

       2.   Mr. Kennedy ignores evidence that does not support his position ................................ 11

    B.   Mr. Kennedy's opinions are also unreliable because he has not shown that the EF Settlement Agreements are economically comparable licenses. ................................................ 12

       1.   Mr. Kennedy does not meaningfully account for the EF Settlement Agreements being litigation settlements. ......................................................................................... 14

       2.   Mr. Kennedy does not meaningfully account for the EF Settlement Agreements being worldwide licenses for EcoFactor's entire patent portfolio ................................... 17

IV.     CONCLUSION ...................................................................................................... 19

PUBLIC VERSION

# **TABLE OF AUTHORITIES**

Page(s)

Cases

*AVM Techs., LLC v. Intel Corp.*,
  927 F. Supp. 2d 139 (D. Del. 2013) ......................................................................... 16

*Baltimore Aircoil Co. v SPX Cooling Tech. Inc.*,
  Civ. No. CCB-13-2053, 2016 WL 4426681 (D. Md. Aug. 22, 2016) ...................................... 16

*Bank of N.Y. Mellon Tr. Co., N.A. v. Solstice ABS CBO II, Ltd.*,
  910 F. Supp. 2d 629 (S.D.N.Y. 2012) ......................................................................... 12

*DataQuill Ltd. v. High Tech Computer Corp.*,
  887 F. Supp. 2d 999 (S.D. Cal. 2011) ......................................................................... 13

*Ericsson, Inc. v. D-Link Systems*,
  773 F.3d 1201 (Fed. Cir. 2014) ......................................................................... 18

*Evans v. Jeff D.*,
  475 U.S. 717 (1986) ......................................................................... 14

*Exmark Manufacturing Co., Inc. v. Briggs & Stratton Power Products Group*,
  879 F.3d 1332 (Fed. Cir. 2018) ......................................................................... 10

*Fail-Safe, L.L.C. v. A.O. Smith Corp.*,
  744 F. Supp. 2d 870 (E.D. Wis. 2010) ......................................................................... 12

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) ......................................................................... 2, 3

*Hanson v. Alpine Valley Ski Area, Inc.*,
  718 F.2d 1075 (Fed. Cir. 1983) ......................................................................... 6, 14

*In re Bextra and Celebrex Marketing Sales Practices and Product Liability Litigation*,
  524 F. Supp. 2d 1166 (N.D. Cal. 2007) ......................................................................... 12

*Info-Hold v. Muzak LLC*,
  No. 1:11-CV-283, 2013 WL 4482442 (S.D. Ohio Aug. 20, 2013) ......................................................................... 10

*Johnson v. Arkema, Inc.*,
  685 F.3d 452 (5th Cir. 2012) ......................................................................... 2

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
  694 F. 3d 51 (Fed. Cir. 2012) ......................................................................... 13, 14

PUBLIC VERSION

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
 2011 WL 7563818 (E.D. Tex. Jan. 7, 2011) ........................................................................ 18

*Lucent Techs. Inc. v. Gateway, Inc.*,
 580 F.3d 1301 (Fed. Cir. 2009) ................................................................................ 9, 11, 13

*MLC Intellectual Property, LLC v. Micron Tech. Inc.*,
 10 F. 4th 1358 (Fed. Cir. 2021) ........................................................................................... 9

*Mondis Tech. Ltd v. LG Elecs., Inc.*,
 407 F. Supp. 3d 482 (D.N.J. 2019) .................................................................................... 18

*Omega Patents, LLC v. CalAmp Corp.*,
 13 F.4th 1361 (Fed. Cir. 2021) .......................................................................................... 18

*Pavo Solutions LLC v. Kingston Technology Co., Inc.*,
 No. 8:14-CV-01352-JLS-KES, 2019 WL 8138163 (C.D. Cal. Nov. 20, 2019) ...................... 9

*Plexxikon Inc. v. Novartis Pharmaceuticals Corp.*,
 4:17-cv-04405-HSG, 2021 WL 97544 (N.D. Cal. Jan. 12, 2021) ......................................... 14

*Prism Techs. LLC v. Sprint Spectrum L.P.*,
 849 F.3d 1360 (Fed. Cir. 2017) .......................................................................................... 15

*Trell v. Marlee Electronics Corp.*,
 912 F.2d 1443 (Fed. Cir. 1990) ............................................................................................ 6

*U.S. v. Whitfield*,
 590 F.3d 325 (5th Cir. 2009) ................................................................................................ 2

*US Salt, Inc. v. Broken Arrow, Inc.*,
 563 F.3d 687 (8th Cir. 2009) .............................................................................................. 10

*Wi-Lan Inc. v. Alcatel-Lucent USA Inc.*,
 2013 WL 10404065 (E.D. Tex. Jun. 28, 2013) ................................................................... 19

*Worldtech Systems, Inc. v. Integrated Networks Solutions, Inc.*
 609 F.3d 1308 (Fed. Cir. 2010) ................................................................................... 8, 9, 13

*Zimmer Surgical, Inc. v. Stryker Corp.*,
 365 F. Supp. 3d 466 (D. Del. 2019) .............................................................................. 16, 17

Rules

Fed. R. Evid. 702 ...................................................................................................... 1, 2, 19

PUBLIC VERSION

EcoFactor's damages expert, Mr. David Kennedy, seeks to offer unreliable damages opinions based on an unsupported "established royalty." According to Mr. Kennedy, EcoFactor has an "established royalty" for licensing of the asserted patents and similar technology of $5.16 per unit.  This is supposedly the "minimum" EcoFactor would accept in license, and it is the rate ultimately opined by Mr. Kennedy as the reasonable royalty rate that should govern here. No documentary or mathematical evidence, however, supports the $5.16 per unit figure or supports the notion of an "established royalty."

While three litigation settlement agreements summarily state—in a wherefore clause at the start of the agreement—that EcoFactor unilaterally "believes" the settlement is based on a rate of $5.16 per unit, the settlement agreements themselves are lump sum payments in amounts far less than what EcoFactor seeks here.  They do not recite unit sales, and EcoFactor has offered no evidence of unit sales. Mr. Kennedy admitted in deposition that the "established royalty" was based entirely on the *ipse dixit* of EcoFactor.  Even worse, EcoFactor has relied on privilege and otherwise hid any information regarding how it internally arrived at the so-called $5.16 calculation.

Mr. Kennedy took no steps to verify mathematically that $5.16 per unit was a rate *ever* utilized in any EcoFactor license.  At the same time, Mr. Kennedy ignored evidence, including statements in the settlement agreements themselves, that $5.16 per unit was *not* an agreed upon royalty rate nor was it the basis of the settlements. For example, one of the agreements expressly states its lump-sum amount "is not based upon sales and does not reflect or constitute a royalty." In short, Mr. Kennedy's opinions regarding the "established royalty" and the conclusions he draws from this erroneous starting point lack foundation, are unreliable, and must be excluded under Rule 702.

PUBLIC VERSION

Mr. Kennedy's opinion should also be excluded because he fails to meaningfully account for the economic differences of EcoFactor's allegedly comparable licenses.  Mr. Kennedy all but ignores key differences of the licenses that would not be present during a hypothetical negotiation.  As one example, the licenses are litigation settlements, settling multiple litigations in different forums, where many different patents were asserted against the licensees.  The licenses are also worldwide licenses for EcoFactor's *entire* patent portfolio (constituting approximately 40 issued patents), rather than U.S. licenses for the two patents asserted here.  Although these licenses may have been properly used as a *datapoint*, taking into account the relevant differences, Mr. Kennedy did not do that.  Instead, Mr. Kennedy provides some superficial recognition to some of the differences but then wholly accepts the licenses' alleged $5.16 royalty rate without adjustment.  Therefore, Mr. Kennedy's opinions must also be excluded under Rule 702.

## I.    LEGAL STANDARD.

An expert witness may offer opinion testimony only if (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702. "The reliability prong [of *Daubert*] mandates that expert opinion be grounded in the methods and procedures of science and . . . be more than unsupported speculation or subjective belief." *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (internal quotation omitted)). Expert testimony should be excluded where it amounts to speculation. *See U.S. v. Whitfield*, 590 F.3d 325, 362 (5th Cir. 2009). Any data that the expert relies upon must be tied to the facts of the case by more than the expert's *ipse*

*dixit. See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 137 (1997).

## II.   BACKGROUND: MR. KENNEDY'S DAMAGES OPINION.

Mr. Kennedy's damages opinion is that the two patents-in-suit demand a $5.16 per unit royalty, which, as Mr. Kennedy applies the rate against ecobee, amounts to a ▆▆▆▆▆▆▆▆▆▆▆ damages award.  In his expert report and throughout his deposition, Mr. Kennedy explained that this $5.16 per unit royalty is an "established royalty" created by three litigation settlements: ▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ (together, "EF Settlement Agreements").  *See* Ex. A (Corrected Expert Report of Mr. David Kennedy) ¶¶ 228–234; Ex. B (November 9, 2021 Deposition of David Kennedy) at 90:22–91:1. Mr. Kennedy opines that the date of hypothetical negotiation is November 2019.  Ex. A ¶ 293.

The EF Settlement Agreements were all executed after this Complaint and all settle various district court patent litigations as well as ITC investigations.[2]  Each EF Settlement Agreement states that "Ecofactor [sic] represents that it has agreed to the payment set forth in this Agreement based on what Ecofator [sic] believes is a reasonable royalty calculation of $5.16 per-unit for estimated past and ▆▆▆▆▆▆▆▆▆▆▆ projected future sales of products accused of infringement in the [respective Litigations]."  Ex. C at 1; Ex. D at 1; Ex. E at 1.  In the same clause, the ▆▆▆▆▆▆ Agreement states, "nothing in this clause should be interpreted as agreement by ▆▆▆▆▆ that $5.16 per unit is a reasonable royalty."  Ex. D at 1.  Similarly, in a later section, both the ▆▆▆▆▆▆▆▆▆▆▆ Agreements state its lump-sum amount "is not based upon sales and does not reflect or constitute a royalty."  Ex. C § 3.1; Ex. D § 3.1.

---

[1] Exhibits to the instant motion are attached to the contemporaneously filed Declaration of Ryan Hauer.

[2] ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

PUBLIC VERSION

Each EF Settlement Agreement contains a worldwide license to EcoFactor's entire patent portfolio, which Mr. Kennedy testified contains a number of patents "somewhere in the high 30s." Ex. B at 85:22–86:1.  In Mr. Kennedy's view, however, the patents that are called out in the exhibits to the Agreements—the patents that EcoFactor was asserting against the licensees— "were the focus of the deal[s]."  *See* Ex. A at ¶¶ 308–309.  Mr. Kennedy does not compare the value of the patents at issue in this case against the value of the dozens of other patents included in the agreements—which, notably, include patents that EcoFactor is asserting against ecobee in other litigations (including in this Courthouse).  *See EcoFactor v. ecobee*, No. 6:21-cv-00428 (W.D.T.X.).

The EF Settlement Agreements all require the licensees "make a non-refundable, one-time, lump-sum payment by wire transfer to EcoFactor" in amounts of ████████████ ██████████████████████████████  There is no other monetary consideration mentioned in the Agreements.  None of the Agreements contain any past or projected sales information for any product.  Yet Mr. Kennedy still opines that "each of [the EF Settlement Agreements] indicated that the dollar per-unit royalty rate that the parties relied on to calculate the lump sum was $5.16." Ex. A at ¶ 305.  Mr. Kennedy also states that he understood that ██████████ ████████████████████████████████ per a conversation he had with Shayan Habib, EcoFactor's CEO.  *Id*. at ¶ 231.

In his report, Mr. Kennedy did not conduct an apportionment analysis to distinguish the technology disclosed in the patents asserted here from other technology or features in ecobee's accused products, which was confirmed at his deposition.  *See* Ex. B at 124:3–24.  Instead, Mr. Kennedy solely relied on the EF Settlement Agreements for a "comparable license" approach which, in Mr. Kennedy's view, "gets to a minimum value for the patented features that are

4

common between the different companies and the different licensees." *Id*.  Although Mr. Kennedy does discuss the *Georgia-Pacific* factors for calculating a reasonable royalty, he mainly relies on factor 1—"the royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty"—to determine that the patent-in-suit demand the same $5.16 royalty described in the EF Settlement Agreements.  *See* Ex. A ¶¶ 228–234, 304 ("In my opinion, the most relevant information that the parties would have considered during the Hypothetical Negotiation would have been the royalty rate that EcoFactor established for the Patented Technology.").  Mr. Kennedy does not adjust the $5.16 royalty rate based on any of the *Georgia-Pacific* factors, even though he opines that there are factors that have either upward or downward effect on the royalty resulting from the hypothetical negotiation. Ex. A. ¶¶ 228–316.

## III.   MR. KENNEDY'S OPINION RELIES ON A FAULTY ASSUMPTION OF A $5.16 ESTABLISHED ROYALTY AND FAILS TO ACCOUNT FOR THE NON-COMPARABILITY OF THE SETTLEMENT AGREEMENTS.

Mr. Kennedy's damages opinions are based on the faulty assumption that $5.16 per unit is an established royalty for the two patents in suit.  In Mr. Kennedy's view, he did not have to apportion that rate to the usage and importance of the ecobee accused features themselves. Ex. B at 85:22–86:1. Instead, Mr. Kennedy is entirely reliant on the EF Settlement Agreements as showing an established royalty, which, per Mr. Kennedy, apportions the accused features because of similarities of the accused technologies. *Id*.  Indeed, Mr. Kennedy does not provide for any alternative analysis besides his "comparable license" approach.

Mr. Kennedy's comparable license approach should be excluded for two distinct reasons. First, Mr. Kennedy does not show that EcoFactor's allegedly "established royalty" was "established" at all.  That is, there is no evidence that any licensee actually applied any rate, let alone $5.16, to arrive at the lump sums found in the EF Settlement Agreements.  Second, Mr.

PUBLIC VERSION

Kennedy fails to show that the EF Settlement Agreements are economically comparable to the license that would result from the hypothetical negotiation.

### A.  Mr. Kennedy's finding of an "established royalty" is unreliable, unproven, and not tied to the facts of the case.

Mr. Kennedy's opinions are unreliable because the $5.16 per unit royalty rate cannot be an "established royalty" for a reasonable royalty analysis.  There is no proof—anywhere in the record—that the $5.16 was applied to the lump sum amounts in the EF Settlement Agreements or in any other agreement.  Mr. Kennedy's *only* support that the rate was applied to any actual or projected sales is the EF Settlement Agreements themselves, a conversation he had with Mr. Habib, and one EcoFactor email to ███ mentioning, but not applying, the rate. Ex. A ¶ 181, n.167.  This support proves nothing—and certainly does not demonstrate the existence of an "established" royalty rate.  The EF Settlement Agreements contain no sales data.  Mr. Habib's testimony makes clear that he also did not know whether the rate was applied, instead deferring that knowledge, if it exists, to EcoFactor's litigation counsel who negotiated those agreements.  And a review of the negotiation-related emails, one of which Mr. Kennedy relies on, does not fill any information gaps.  Instead, the emails, many of which Mr. Kennedy ignores, show that the lump-sum amounts in the EF Settlement Agreements were agreed to after conventional back and forth negotiation unrelated to sales information.

### 1.  Mr. Kennedy did not, and cannot, show that the EF Settlement Agreements support a $5.16 rate.

"[F]or a royalty to be established, it 'must be paid by such a number of persons as to indicate a general acquiescence in its reasonableness by those who have occasion to use the invention.'" *Trell v. Marlee Electronics Corp.,* 912 F.2d 1443, 1446 (Fed. Cir. 1990) (*quoting Hanson v. Alpine Valley Ski Area, Inc.,* 718 F.2d 1075, 1078 (Fed Cir. 1983)). Here, there is no

PUBLIC VERSION

evidence that a $5.16 royalty has ever been "paid" by anyone.  For instance, at his deposition,

Mr. Kennedy confirmed that he has never seen any EF Settlement Agreement-related past or

projected sales data:

> Q. I believe you testified earlier that you did not do the math to
> calculate the number of unit sales, actual or projected unit sales, by
> the $5.16. Is that true of each of these three license agreements?
> You did not do the math to make that calculation?
>
> A. Yeah, I did not have the information to be able to do that math.

Ex. B at 107:24–108. Mr. Kennedy went on to testify that he had asked EcoFactor for such sales

information, but "there was not specific documentation related to that." *Id*. at 108:7–19.

In lieu of relying on any EcoFactor licensee sales data, Mr. Kennedy simply takes

EcoFactor's word that the rate was applied.  For the ████ and ████ agreements, Mr.

Kennedy relies on testimony and a conversation with Mr. Habib to opine that "[t]he lump-sum

royalty was derived by applying a per-unit royalty calculation of $5.16 to [licensee's] past and

projected sales of products accused of infringement in the Litigation."  *See* Ex. A. at ¶181 & n.

167 ████ ); ¶ 186 & fn. 9 (████).  Mr. Kennedy has a similar opinion for the ██

Agreement but does not rely Mr. Habib's testimony or any conversations. *Id*. ¶ 192.  Mr.

Kennedy also often refers to the $5.16 per unit rate as "████████████

████████████████" Ex. A ¶¶

231, 301.  In his deposition, Mr. Kennedy admitted that he did not know how Mr. Habib came up

with the rate, but trusted that it was based on some sort of "calculation":

> Q. Where did Mr. Habib come up with the notion that he wouldn't
> take less than $5.16?
>
> A. Yeah. I don't know, other than him believing that was a fair
> rate, and I don't know the history behind that and his rate card and how it
> developed over time, just that he arrived at that number by the time he
> negotiated with these three parties.

But it does seem like a number that was – had some type of
calculation or movement between numbers to get to it just because it's not
a round number . . . .

Ex. B at 101:9–21.  As shown above, Mr. Kennedy made no effort to determine how the

$5.16 per unit rate was determined.  Mr. Habib's testimony does not help with the rate's origin.

He testified that EcoFactor believed the $5.16 per unit was a reasonable royalty based on

"discussion that we had with our experts" and EcoFactor's counsel, as well as reviewing the

patents themselves.  Ex. F at 292:20–293:13. When asked what documents "reflect the

reasonable royalty analysis," Mr. Habib referred to "[t]he patents themselves, confidential

information or privileged information" as well as "assessment from experts."  *Id*. at 293:23–

294:13. Mr. Habib could not name the expert that helped with this alleged royalty analysis.  *Id*. at

296:9–14.  Therefore, ecobee has no way of knowing whether the $5.16 was determined based

on a sound methodology, or if it was just made up by Mr. Habib and his attorneys.

Mr. Habib's testimony also does not provide any assurances that the $5.16 per unit rate

has ever been applied to any sales.  For each EF Settlement Agreement, Mr. Habib testified that

he was not privy to any licensee past or projected sales information and that EcoFactor did not

maintain any non-privileged documents reflecting EcoFactor's reasonable royalty calculation of

$5.16.  *See* Ex. F at 295:6–12 & 296:9–297:4 ███████; 328:13–329:2 ███████ 331:21–332:7

███).  To the extent anyone associated with EcoFactor had any licensee sales information, Mr.

Habib testified that such information would have been provided to "counsel."  *Id*.

Per the Federal Circuit, Mr. Kennedy's lack of any mathematical analysis or calculations

to verify that the $5.16 was used makes his opinion regarding the rate unreliable for the purposes

of demonstrating an established royalty.  For instance, in *Worldtech Systems, Inc. v. Integrated

Networks Solutions, Inc.*, the Federal Circuit rejected a plaintiff's use of two lump-sum license

agreements because "[n]either license describe[d] how the parties calculated each lump sum,

licensees' intended products, or how many products each licensee expected to produce." 609 F.3d 1308, 1320 (Fed. Cir. 2010). Without this additional data, the Court found that "the licenses offered the jury 'little more than a recitation of royalty numbers.'" *Id.* (*citing Lucent Techs. Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1327 (Fed. Cir. 2009)). Similarly, in *MLC Intellectual Property, LLC v. Micron Tech. Inc.*, the Federal Circuit affirmed a court's exclusion of testimony because the expert "did not provide mathematical analysis to derive the 0.25% royalty rate from the lump-sum payments in the [allegedly comparable] licenses." 10 F. 4th 1358, 1368 (Fed. Cir. 2021). As such, the Federal Circuit affirmed that "the district court could reasonably determine that those licenses cannot support testimony that the lump-sum payments were, in fact, based on that royalty rate." *Id.*; *see also Pavo Solutions LLC v. Kingston Technology Co., Inc.*, No. 8:14-CV-01352-JLS-KES, 2019 WL 8138163, at *5 (C.D. Cal. Nov. 20, 2019) (excluding expert opinion where the expert had "not demonstrated how the lump sums extracted from [license] agreements could be accurately converted to a royalty rate").

Here, per his testimony and expert report, Mr. Kennedy intends to testify at trial that the lump-sum amounts in the EF Settlement Agreements were calculated by applying a $5.16 royalty rate to the licensees' past and projected sales. But as discussed above, neither Mr. Kennedy, nor Mr. Habib, nor EcoFactor have come forward with any evidence of that calculation for any of the Agreements and, like the experts in *Worldtech Systems*, *MLC Intellectual Property*, and *Pavo*, Mr. Kennedy has not done any analysis to derive that rate. To the extent any information about past or projected sales exists, it has not been produced and appears to rest solely with EcoFactor's litigation counsel, based on the counsel's emails and Mr. Habib's testimony.[3]

---

[3] Defendants requested the Court order EcoFactor to produce such sales information, to the extent it exists, at an Oct. 18, 2021 discovery hearing. As a result, the Court ordered that EcoFactor "provide information supporting the 5.16 royalty rate to the Defendants by Friday," October 22. ECF No. 81. That Friday, EcoFactor confirmed "that it has already produced, and

Even if Mr. Habib or EcoFactor's counsel were reliable sources of information as to the $5.16 per-unit rate, an expert may not rely upon a party's or an attorney's statements without independent analysis.  In *Info-Hold v. Muzak LLC*, No. 1:11-CV-283, 2013 WL 4482442, at *5 (S.D. Ohio Aug. 20, 2013), *rev'd in part on other grounds*, 783 F.3d 1365 (Fed. Cir. 2015), for example, the court rejected testimony of an expert who had "relie[d], without verification, on Plaintiff's employees and Plaintiff's counsel for information crucial to his opinions."  As the court explained, "[a]ll of [the expert's] knowledge regarding convoyed sales [had been] derived from employees of Plaintiff," and the expert had simply accepted that all of the "Defendant's revenues were driven by demand for the [accused products]," "because he [had been] told to make this assumption by [] counsel."  *Id.*, at *5.  Because the expert "did not independently verify anything that Plaintiff's CEO or Plaintiff's counsel told him," his opinion was unreliable. *Id.*  Here, because Mr. Kennedy took EcoFactor's statements at face value without verifying those statements, his opinion is unreliable.  *US Salt, Inc. v. Broken Arrow, Inc*., 563 F.3d 687, 691 (8th Cir. 2009) (affirming district court's exclusion of "expert testimony because he relied almost exclusively on [the CEO's] speculative estimates without any independent verification").

Since there is no evidence that the rate was ever applied, and there is no analysis of how the $5.16 rate was determined, Mr. Kennedy is effectively using a rate that is "plucked . . . out of nowhere."  *Exmark Manufacturing Co., Inc. v. Briggs & Stratton Power Products Group*, 879 F.3d 1332, 1351 (Fed. Cir. 2018) ("It is not enough for an expert to simply assert that a particular royalty rate is reasonable in light of the evidence without tying the proposed rate to that evidence.").  Thus, because Mr. Kennedy's testimony regarding these licenses amounts to "little more than a recitation of royalty numbers," Mr. Kennedy's opinions must be excluded.  *Lucent*

---

is not withholding, the non-privileged information supporting Mr. Kennedy's proposed $5.16 royalty rate."  Ex. G (email from Aichele to Porto).

*Techs. Inc.*, 580 F.3d at 1329.

> **2.      Mr. Kennedy ignores evidence that does not support his position.**

Mr. Kennedy also fails to consider *real world* evidence tending to show that the $5.16 per unit rate was not actually applied to any past or projected sales.  Rather than being tied to sales data, the lump-sum amounts appear to be the result of run-of-the-mill negotiations between the parties.  For example, in EcoFactor-produced emails, ███ counsel offered ███ to settle its cases, which EcoFactor countered by proposing either (1) a ███ payment, plus an ongoing royalty of $5.16 per unit, or (2) a one-time lump-sum of ███.  Ex. H (ECODCT_0229377).  Per the ███ Agreement, the parties eventually landed on a lump-sum payment of ███, but there is no correspondence related to any sales data, and there is no correspondence showing whether Daikin agreed to the $5.16 per unit royalty, as opposed to some other one-time lump-sum arrangement, like what EcoFactor originally proposed.

Mr. Kennedy also ignores similar evidence from the ███ negotiations.  For ███, in view of some now-redacted sales information, EcoFactor offered a lump-sum license of ███ without mentioning the $5.16 per-unit royalty.  Ex. I (ECODCT_0229572).  Later in the negotiation, ███ moved from ███ while EcoFactor "moved from ███ with no discussion of the $5.16 per unit royalty or any sales information.  Ex. J (ECODCT_0229549).  Indeed, ███ initially rejected the $5.16 per unit language in the first draft of the settlement agreement (Ex. K (ECODCT_0229603-05)) only to eventually agree to include it with language clarifying that "nothing in this clause should be interpreted as agreement by ███ that $5.16 per unit is a reasonable royalty" (Ex. L (ECODCT_0229518-19)).

Mr. Kennedy also ignores that two of the agreements, ███, explicitly state that the $5.16 royalty was ***not applied to any licensee sales***. Ex. C at 1; Ex. D § 3.1.  When

11

pressed about this at his deposition, Mr. Kennedy could only speculate that the language was there "to make sure that this rate can't be just taken out of the agreement and used in another matter as something that was a determined reasonably royalty."  Ex. B at 100:12–23. Perplexingly, Mr. Kennedy does just that here: he used EcoFactor's $5.16 royalty with no context and applied it to this separate matter.  Mr. Kennedy cannot selectively disregard portions of the license agreements while fully adopting other clauses to form his opinion.  Therefore, Mr. Kennedy's failure to address any evidence tending to undermine his "litigation-created conclusion" of $5.16 as a per-unit royalty renders his opinion unreliable.  *See In re Bextra and Celebrex Marketing Sales Practices and Product Liability Litigation*, 524 F. Supp. 2d 1166, 1184 (N.D. Cal. 2007) (rejecting as unreliable opinion where "[the expert] reaches his opinion by first identifying his conclusion . . . and then cherry-picking observational studies that support his conclusion and rejecting or ignoring the great weight of the evidence that contradicts his conclusion."); *Bank of N.Y. Mellon Tr. Co., N.A. v. Solstice ABS CBO II, Ltd.*, 910 F. Supp. 2d 629, 648 (S.D.N.Y. 2012) (excluding damages calculation based on expert's "faulty assumption" that contradicted contractual terms); *Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 889 (E.D. Wis. 2010) (rejecting expert opinion where "it is readily apparent that [the expert] all but 'cherry picked' the data he wanted to use").

**B.   Mr. Kennedy's opinions are also unreliable because he has not shown that the EF Settlement Agreements are economically comparable licenses.**

Mr. Kennedy's damages opinions should be independently excluded because the EF Settlement Agreements are not economically comparable to the ecobee license that would have resulted from the hypothetical negotiation.[4]  The licenses are not economically comparable

---

[4] ecobee also contends that the EF Settlement Agreements are not technically comparable to the hypothetical negotiation and reserves the right to pursue that defense at trial. For the purposes of this motion, ecobee is only challenging Mr. Kennedy's failure to account for the economic

because Mr. Kennedy does not meaningfully account for the fact that (1) the EF Settlement

Agreements are litigation settlements, as opposed to licenses entered in during the normal course

of business; and (2) the EF Settlement Agreements are worldwide licenses for EcoFactor's entire

portfolio, as opposed to a U.S. license for the patents-in-suit.  Indeed, Mr. Kennedy himself

admits that "[e]ach of [the] important differences between worldwide, convenience, portfolio

licenses and the Hypothetical License demonstrate the importance of identifying truly

comparable licenses and why it would be inappropriate, from an economic perspective, to use

actual licenses, without significant adjustments, to predict the expected royalty outcome of the

Hypothetical Negotiation."  Ex. A ¶ 175.  As discussed below, Mr. Kennedy ultimately fails to

make such "significant adjustments" to account for these differences. Thus, Mr. Kennedy's

license analysis should be excluded.

It is improper to "rely on license agreements that were radically different from the

hypothetical agreement under consideration to determine a reasonable royalty."  *Lucent Techs.,*

580 F.3d at 1316 (internal quotation marks omitted). "[C]omparisons of past patent licenses to

the infringement must account for the technological and economic differences between

them." *Worldtech Sys., Inc.,* 609 F.3d 1308 at 1320 (internal quotation marks omitted). "When

relying on licenses to prove a reasonable royalty, alleging a loose or vague comparability

between different technologies or licenses does not suffice." *LaserDynamics, Inc. v. Quanta*

*Computer, Inc.,* 694 F. 3d 51, 79 (Fed. Cir. 2012). "The testimony of a damages expert in

a patent suit who relies on non-comparable licenses in reaching his royalty rate should be

excluded." *DataQuill Ltd. v. High Tech Computer Corp.,* 887 F. Supp. 2d 999, 1022 (S.D. Cal.

2011).

---

differences of the licenses.

PUBLIC VERSION

### 1. Mr. Kennedy does not meaningfully account for the EF Settlement Agreements being litigation settlements.

Mr. Kennedys' opinions should be excluded because he does not account for the EF Settlement Agreements being entered into under the threat of, and during, litigation. Although not barred, Federal Circuit precedent is hostile toward using litigation settlement agreements in proving a reasonable royalty. *See LaserDynamics,* 694 F.3d at 77–78 ("The notion that license fees that are tainted by the coercive environment of patent litigation are unsuitable to prove a reasonable royalty is a logical extension of *Georgia–Pacific,* the premise of which assumes a voluntary agreement will be reached between a willing licensor and a willing licensee...."). As such, the Federal Circuit has "cautioned [district courts] to consider the license in its proper context within the hypothetical negotiation framework to ensure that the reasonable royalty rate reflects 'the economic demand for the claimed technology.'" *Id*. at 77. For settlements generally, the Supreme Court has explained the normal settlement calculus for litigants: "Most defendants are unlikely to settle unless the cost of the predicted judgment, discounted by its probability, plus the transaction costs of further litigation, are greater than the cost of the settlement package." *Evans v. Jeff D.*, 475 U.S. 717, 734 (1986); *see also Hanson*, 718 F.2d at 1078–79 (noting that litigation settlement offers and licenses "should not be considered evidence of an established royalty since license fees negotiated in the face of a threat of high litigation costs may be strongly influenced by a desire to avoid full litigation.") (quotations omitted). Thus, "settlement licenses are treated much like other licenses, requiring the proponent of the license to establish sufficient comparability while accounting for any differences." *Plexxikon Inc. v. Novartis Pharmaceuticals Corp.*, 4:17-cv-04405-HSG, 2021 WL 97544 at \*6 (N.D. Cal. Jan. 12, 2021).

Mr. Kennedy more or less disposes of the fact that the EF Settlement Agreements are

settlement agreements in one sentence.  He opines, without citing anything, that the EF

Settlement Agreements "reflected a discount due to the fact that the licensees disputed

infringement and validity, unlike the circumstances of the Hypothetical Negotiation." Ex. A ¶

313.  Mr. Kennedy does not provide any background information about the litigations preceding

the agreements (like the amount of damages asserted, the number of parties, the litigation

forums, or whether there were counterclaims asserted) or the overall context of the settlements.

For example, Mr. Kennedy does not describe, let alone adjust for, whether the litigation

agreements were entered into early in the litigations, where uncertainty and the threat of high

litigation costs is highest.  *See Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1370

(Fed. Cir. 2017).  Rather, Mr. Kennedy presents his brief "discount" theory and opines that the

same $5.16 rate is appropriate here.

　　These omissions matter because there is again *real-world* evidence, which is ignored by

Mr. Kennedy, showing that the EF Settlement agreements were entered into amid the threat of

litigation expenses—particularly during the onset of the COVID-19 pandemic—as opposed to

accounting for any value of the patents.  Indeed, EcoFactor's own documents show that when

█████ contacted EcoFactor for settlement, █████ counsel stated that █████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ Ex. M (ECODCT_0229328).  Likewise, █████ counsel

noted that its initial █████████████████████████████

██████████████ and ██████████████████████████████

████████████████████████████████████ Ex. N

(ECODCT_0229450).  Emails from ████████ show that its settlement was driven by ITC

investigation-related issues, including that ██████████ no longer imported its accused

products into the United States.  Ex. O (ECODCT_0229532).  ███████ ended up executing a

settlement agreement ████████████████████████ rather than referencing any value

of EcoFactor's alleged inventions.  Ex. P (ECODCT_0229535).

Mr. Kennedy does not mention these EcoFactor settlement negotiation documents or

adjust his royalty to account for the EF Settlement Agreements being licenses to end litigation.

Moreover, none of the documents mention any EcoFactor "discount," Mr. Kennedy's only

opinion related to litigation settlement.  While there is no outright bar to referring to litigation

settlements as data points in a *Georgia-Pacific* analysis, that is not what Mr. Kennedy does here.

Rather, Mr. Kennedy wholly accepts the rates set forth in the settlement agreements, with no

adjustment, and does not give any reliable reason for doing so.  Therefore, Mr. Kennedy's

opinions that the EF Settlement Agreements are "comparable licenses" should be excluded

because Mr. Kennedy has not even attempted to adjust for the settlement nature of the licenses,

or provide any background on the litigations, which is fatal to his economic comparability

analysis.  *See, e.g., AVM Techs., LLC v. Intel Corp.*, 927 F. Supp. 2d 139, 143–44 (D. Del. 2013)

(excluding expert opinion as "completely speculative without, at a minimum, some analysis of

the litigation that led to the settlement"); *Baltimore Aircoil Co. v SPX Cooling Tech. Inc.*, Civ.

No. CCB-13-2053, 2016 WL 4426681 at *24 (D. Md. Aug. 22, 2016) ("For a settlement

agreement to meet this minimum threshold of relevance, the expert must provide *some* analysis

on the litigation underlying the agreement. Without this analysis, the factfinder cannot accurately

assess comparability.") (emphasis in original); *Zimmer Surgical, Inc. v. Stryker Corp.*, 365 F.

Supp. 3d 466, 496 (D. Del. 2019) (excluding testimony where "[expert] engages in no analysis of

the underlying litigation and how it may have affected the royalty rate").

> **2.**     **Mr. Kennedy does not meaningfully account for the EF Settlement Agreements being worldwide licenses for EcoFactor's entire patent portfolio.**

Mr. Kennedy's opinions should also be excluded because he does not meaningfully account for the EF Settlement Agreements being worldwide licenses for EcoFactor's entire patent portfolio.  In his report, Mr. Kennedy states that "in the case of a Hypothetical Negotiation for patent damages purposes, only U.S. patents are at issue and only infringing activities in the U.S. are licensed." Ex. A ¶ 174.  He also notes that "the Hypothetical License in this case is only for the Patents in Suit," as opposed to a portfolio license.  *Id*. ¶ 168 *see also* ¶ 175.  Instead of adjusting the rate or performing an analysis to account for those factors here, Mr. Kennedy only relies on EcoFactor's licensing policy, which is, per Mr. Kennedy's conversations with Mr. Habib, that ███████████████████████████████████████████████ Ex. A ¶ 310; *see also* ¶ 305.

Mr. Kennedy cannot rely on EcoFactor's (or Mr. Habib's) licensing policy in place of an analysis that accounts for the economic differences of his allegedly comparable licenses.  As discussed, based on his conversation with Mr. Habib, and in an attempt to account for the fact that mostly different EcoFactor patents were asserted against the EF Settlement Agreement licensees[5], Mr. Kennedy concludes ███████████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████ ████████ Ex. A ¶¶ 309 & 306 n. 283. ███████████████ ███████████████████████████████████████████

_____

[5] Mr. Kennedy plots all the different patents asserted against ██████████████ at ¶ 306 of his Report (Ex. A).  Notably, none of the patents-in-suit here—the '382 and '327—were asserted against ███.

████████████████████████████████████████

Using this approach, Mr. Kennedy fails to "account for . . . distinguishing facts when invoking [the EF Settlement Agreements] to value the patented invention." *Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361, 1380 (Fed. Cir. 2021).  That includes accounting for the portfolio nature of the license.  It is not enough to "state that [the] patents cover [similar] technology." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 2011 WL 7563818 at *3 (E.D. Tex. Jan. 7, 2011). Further, the Federal Circuit has rejected experts replying on such a "one price for all" licensing policy, like what Mr. Kennedy relies on here, to establish a reasonable royalty. *Omega Patents*, 13 F.4th at 1379.  This is because such a theory "would permit [a patent owner] to obtain a particular royalty rate merely by relying on its internal 'policy' without regard to comparability" and "improperly permit [a patent owner] to hide behind its generic licensing arrangement to avoid the task of apportionment." *Id.*   And at least one Court has found that relying on such a "threshold licensing" (*i.e.*, using a single rate for access to technology) violates the Federal Circuit's apportionment requirement because "a license which is designed so that the underlying patents have no incremental value cannot at the same time be evidence of 'the incremental value that the patented invention adds to the end product.'" *Mondis Tech. Ltd v. LG Elecs., Inc.*, 407 F. Supp. 3d 482, 493 (D.N.J. 2019), *appeal dismissed sub nom. Mondis Tech. Ltd. v. LG Elecs. Inc.*, 6 F.4th 1379 (Fed. Cir. 2021) (*citing Ericsson, Inc. v. D-Link Systems*, 773 F.3d 1201, 1226 (Fed. Cir. 2014)).

Mr. Kennedy also opines, again citing only a conversation with Mr. Habib, that "the royalty EcoFactor receives is derived from those patents EcoFactor believes are infringed by the licensee" and "little to no value is assigned to other patents that may be included in the license." Ex. A ¶ 232.  But again, EcoFactor emails that Mr. Kennedy does not address show EcoFactor

PUBLIC VERSION

believed that there was at least a ███████ difference between "a fully paid up license to . . . asserted patents" and "a fully paid up license to all EcoFactor patents."  Ex. Q (ECODCT_0229387) (████████████████████████████████████████ ██████████████████).  It makes no sense for Mr. Kennedy to opine that "the seven patents that EcoFactor asserted in litigation against ███████ were the focus of that negotiation and the determination of the agreed royalty," when clearly EcoFactor did not view the asserted patents and its portfolio that way in at least ████████ case.  Ex. A ¶ 308; *see also id.*  Mr. Kennedy's failure to consider that fact or apportion the $5.16 rate at all to account for such differences is fatal to his opinion.

Therefore, since Mr. Kennedy "does no apportionment to account for the differences between the worldwide portfolio licenses and a license to the patents-in-suit for U.S. sales of [ecobee's] accused products," Mr. Kennedy's opinions relying the licenses should be excluded. *Wi-Lan Inc. v. Alcatel-Lucent USA Inc.*, 2013 WL 10404065 at *3–4 (E.D. Tex. Jun. 28, 2013) (finding an expert's mere "consideration of all the evidence is a poor substitute for the required analysis that parses an alleged infringer's profits for patented versus unpatented features").

IV.   **CONCLUSION**

For the reasons stated above, Mr. Kennedy's reliance on the EF Settlement agreements to opine that $5.16 per unit is a reasonable royalty in this case should be excluded.  Since Mr. Kennedy does not provide any alternative damages opinions besides applying the $5.16 rate to arrive at a lump sum award, all of Mr. Kennedy's damages opinions should be excluded under Rule 702.

The undersigned hereby certifies the parties have complied with the LR CV-7(g) meet and confer requirement. Plaintiff, through its counsel, is opposed to this motion.

PUBLIC VERSION

Dated:  November 19, 2021                     Respectfully submitted,

                                              */s/ Ryan B. Hauer*
                                              Rudolph A. Telscher, Jr.
                                              Missouri Bar No. 41072*
                                              rudy.telscher@huschblackwell.com
                                              Kara R. Fussner
                                              Missouri Bar No. 54656*
                                              kara.fussner@huschblackwell.com
                                              Daisy Manning
                                              Missouri Bar No. 62134*
                                              daisy.manning@huschblackwell.com
                                              HUSCH BLACKWELL LLP
                                              190 Carondelet Plaza, Suite 600
                                              St. Louis, MO 63105
                                              314.480.1500 Telephone
                                              314.480.1505 Facsimile

                                              Ryan B. Hauer
                                              Illinois Bar No.6320758*
                                              ryan.hauer@huschblackwell.com
                                              HUSCH BLACKWELL LLP
                                              120 South Riverside Plaza, Suite 2200
                                              Chicago, IL 60606
                                              312.655.1500 Telephone
                                              312.655.1501 Facsimile

                                              *Admitted *Pro Hac Vice*

                                              Jennifer P. Ainsworth
                                              WILSON, ROBERTSON & CORNELIUS, P.C.
                                              909 ESE Loop 323, Suite 400
                                              Tyler, Texas 75701
                                              (903) 509-5000 Main
                                              (903) 509-5001 Direct
                                              (903) 509-5092 Fax
                                              Email: jainsworth@wilsonlawfirm.com

                                              Manny J. Caixeiro
                                              VENABLE, LLP
                                              2049 Century Park East, Suite 2300
                                              Los Angeles, CA 90067
                                              310-229-9900
                                              Fax: 310-229-9901
                                              Email: MJCaixeiro@venable.com

PUBLIC VERSION

Timothy J. Carroll
Vivian Sandoval
Steve M. Lubezny
VENABLE LLP
227 West Monroe Street, Suite 3950
Chicago, IL 60606
312-820-3400
Fax: 312-820-3401
Email: tjcarroll@venable.com
vsandoval@venable.com
smlubezny@venable.com

***Attorneys for Defendant ecobee, Inc.***

PUBLIC VERSION

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of November 2021, I caused the foregoing to be filed under seal electronically with the Clerk of Court and to be served via email upon all counsel of record.

*/s/ Ryan B. Hauer*

HB: 4889-8677-4532.3